## Carter Coal Company v. Hill.

(Decided October 14, 1915.)

### Appeal from Knox Circuit Court.

1. Master and Servant—Mines and Mining—Duty to Prop and Timber—Evidence—Instructions.—In an action by a loader in a mine for damages for personal injuries, evidence examined and held not to show it was the duty of the loader to prop the roof or take down the slate.

2. Master and Servant—Mines and Mining—Duty to Prop and Timber—Delegation of Duty.—Where, under the custom of the mine,

it is the duty of the mine owner to prop or take down the draw slate in the rooms where the men are working, the mine owner cannot escape this responsibility by delegating the duty to a contractor who agrees to take charge of a part of the mine and take the coal out at so much per ton.

3. Master and Servant—Safe Place—Assurance of Safety—Who May Give.—Where, in a mine, the duty devolves upon the mine owner to cross-timber the rooms in order to make them safe, a timber man selected to do the work acts in the place of the master and is a vice principal, whose assurance of safety is an assurance by the master.

4. Master and Servant—Safe Place—Warning of Danger.—A miner cannot recover damages for personal injuries caused by falling slate, where the timber man selected by the mine owner to timber the rooms in the mine warns him that the roof of the room is dangerous and of the danger of working thereunder a sufficient length of time before the accident to enable the miner by the exercise of ordinary care, to stop work and avoid the peril.

5. Trial—Misconduct of Counsel—Improper Argument.—On a trial for damages for personal injuries, argument of counsel considered and held to so far transcend the limits of legitimate debate as to authorize a reversal.

6. Trial—Misconduct of Counsel—Improper Argument—Necessity for Affidavit—Section 340, Sub-section 2, Civil Code—Section 343 Civil Code.—Section 343 Cicil Code requiring that the misconduct of plaintiff's attorney be sustained by affidavits applies only to those cases where the misconduct of counsel does not occur in the presence of the court, or, occurring in his presence, is the subject of dispute. It does not apply where the argument takes place in the presence of the court and is set forth in the bill of exceptions and authenticated by the court.

P. D. BLACK and BLACK & BLACK & OWENS for appellant.

BROWN & NUCKOLS and GOLDEN & LAY for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER.—Reversing.

This is a personal injury case in which plaintiff, W. H. Hill, recovered of defendant, Carter Coal Company, a verdict and judgment for $15,000. The coal company appeals.

The facts are as follows: The company employed certain men to undercut coal by means of electrical cutting machines. After the coal is undercut it is the duty of other employees, called loaders, to shoot or dig down the coal and load it into the cars. This character of work was let out by contract at so much per ton. One G. P.

Brooks had the contract at the place where plaintiff was injured. In carrying out his contract Brooks was assisted by plaintiff, Will Gaylor, and W. F. Detherage. Plaintiff had had about fifteen years' experience as a miner. Prior to the accident he had been working as a loader in another part of the mine. On the morning of the accident he was directed by Brooks to go to work in a room neck. This neck had not been carried a sufficient distance to be called a room. It was only nine or ten feet wide and the work of mining had progressed only for a distance of about twenty feet. Soon after plaintiff went to work he was struck by a large piece of overhanging slate and severely injured. The roof of the neck at this point could have been protected by cross timbers of jack posts, and it was the duty of the company to do this work. Brooks says that it was his duty to do all straight timbering, that is, set the jack posts. Pete Broyles, the timber man, who was also sued, says that it was his duty to do the cross timbering but not set the jack posts. Other witnesses say it was not part of plaintiff's duty either to cross timber, set the jack posts or take down the draw slate. Plaintiff also states that just before going into the room neck he was assured by Pete Broyles, the timber man, that the top of the room was sound. Plaintiff also claims that it was his custom to sound the roof when he went to work; that he did so on the occasion in question and the roof appeared to be solid. Plaintiff admits, however, if he found the slate loose it was then his duty to report it to someone. For the defendant, the mine foreman, York, after stating it was his duty to look after the working places and see that they were safe, testified as follows:

"Q. Tell the jury whose duty it was to take down the draw slate? A. It was the contractor, the men employed loading the coal to take it out; or if it come in large falls we would send a man to help timber it up and pay them for taking it up."

Broyles, the timber man, testified that it was not his duty to look after the loose slate at the face of the coal in the men's working places. It was his duty to cross timber but this could not be done within 12 feet of the face of the coal. He further testified that the place where plaintiff was at work was too close to the face of the coal to permit of cross timbering, and it was no part of his duty to set the jack post, although he admits that he

started to get a jack post for the purpose of setting it up just shortly before the accident occurred. He further claims that just prior to the accident he warned plaintiff of the dangerous condition of the roof. Gaylor, who was working with plaintiff and who had formerly been a contractor and assigned his contract to Brooks, said that, under his contract, the company was to do all cross timbering but he was to set the jack posts. Detherage, who was also working with plaintiff, testified that it was the duty of the man doing the contract to take down the loose slate; that the man engaged in loading coal is always supposed to take care of the loose slate. He further said it was the duty of the man who loaded the coal to set the jack posts. Brooks, the contractor, testified that it was not the duty of the company to timber at the place where the slate fell. It was his duty, under his contract, to have the draw slate taken down and to set the jack posts in the working places.

The accident out of which this action arose occurred in the year 1913, and, therefore, prior to the amendments of 1914 to the Mines and Mining Statutes. Under the statute then in force, it was the duty of the mine owner, after the miners had selected and marked them, to furnish to the miners a sufficient number of caps and props to be used by the miners in securing the roof in their rooms, and at such other working places where by law or custom of those usually engaged in such employment it was the duty of the miners to keep the roof propped. Section 2739b, sub-section 7, Kentucky Statutes, 1909. Manifestly, this statute is not applicable where, by custom or rule of the mine, the duty of propping or timbering does not devolve upon the miner himself. Defendant insists that the trial court erred in assuming in the instructions that it was the duty of the defendant to prop the roof, and, therefore, use ordinary care to make plaintiff's working place reasonably safe. Plaintiff's evidence shows that under the custom of the mine no duty of propping devolved upon him. Defendant insists that the evidence of York, Broyles, Gaylor, Detherage and Brooks, above set forth, shows that it was the duty of the plaintiff and those working with him to do the propping. We have carefully considered the evidence referred to and fail to find any ground for this contention. Brooks says it was his duty, under his contract, to set the jack posts, and a careful reading of the statements of York, Detherage,

Gaylor and Broyles shows that the word "loaders" was used with respect to the contractor and not with respect to the men employed by him to do the work. On the whole, we think the evidence shows that it was the duty of the company to do the propping, but that under the contract between the company and Brooks this duty devolved upon Brooks. Manifestly, if, under the custom of the mine, it was the duty of the company not only to cross timber but to set the props, the responsibility arising from this duty could not be evaded by a contract requiring the contractor to perform the work. If, upon another trial, it should be made to appear that the contractor's employees were themselves charged with the duty of propping or taking down the draw slate, then the question of whose duty it was to do such work under the particular circumstances of this case should be submitted to the jury. Of course, if it was the duty of the plaintiff and those working with him to do this work and they failed to do so, and by reason thereof he was injured, there can be no recovery.

Objection is urged to an instruction authorizing a recovery based on an assurance of safety given by Broyles, the timber man. It is urged that Broyles was not in authority over plaintiff and had no right to bind his master by an assurance of safety. The evidence shows that the duty of cross timbering the rooms devolved upon the company. Broyles was the agent selected by the company to perform this work. He was to do this work when the conditions required and it must be presumed that he possessed superior knowledge of the danger, or lack of danger, growing out of the condition of the roof. As the duty of cross timbering devolved upon the master, and as this duty was entrusted to Broyles, Broyles became a vice principal and took the place of the master, and his assurance of safety was, in effect, an assurance by the master. It follows that the trial court did not err in giving the instruction referred to. We conclude, however, that the rule should work both ways, Broyles not only says that he did not give plaintiff any assurance of safety, but distinctly told him that the roof was dangerous. If the plaintiff had the right, on the one hand, to rely on Broyles' assurance of safety, he should be required, on the other hand, to need Broyles' warning of danger, and the jury would be told, in substance, to find for the defendant if Broyles, the timber man, warned plaintiff of the dangerous condition of the roof and of the danger of

working thereunder a sufficient length of time before the accident to have enabled plaintiff, by the exercise of ordinary care, to stop work and avoid the peril.

In his argument to the jury, counsel for plaintiff used the following language:

"1.  You can take from this corporation its hoarded thousands and millions, and you can't pay this man for these wails and pains and agonies that he has suffered.

"2.  Go out and bring in a verdict here against this wicked soulless corporation, this thing that's got no life, that you can't hurt and that can't feel.

"3.  Something must be done with this lawless corporation that's left a string of desolation and destruction and maiming from one end of Brush Creek to the other, a sample of which you have here before you in Wiley Hill.

"4.  Ah, Marsee, how can you with the hireling soul that you have in you for this wicked corporation up there, how can you look this man in the face?"

Defendant objected to the foregoing statements and moved the court to exclude them from the consideration of the jury. The objections and motion were overruled. The plaintiff's right to recover in this action depended on the company's negligence and his want of contributory negligence. The amount of money which the corporation had and the number of accidents which had happened in its mine were matters about which no evidence was given, or could, with propriety, have been given. Counsel, in going outside of the record and bringing such matters to the attention of the jury, could have had no purpose other than to inflame the minds and incite the passions of the jury. This is not a case of one act of impropriety followed by an admonition of the court to the jury not to consider the statement. It is a case where the limits of legitimate argument were transcended in a number of instances without rebuke or admonition from the court. Such violations of the propriety of debate have been condemned in a number of cases and reversals ordered. Kentucky Wagon Mfg. Co. v. Duganics, 113 S. W., 128; L. & N. R. R. Co. v. Payne, 138 Ky., 275; I. C. R. R. Co. v. Jolly, 119 Ky., 452; McHenry Coal Co. v. Sneden, 98 Ky., 687; L. & N. R. R. Co. v. Crow, 32 Ky. L. R., 1146; C., N. O. & T. P. Ry. Co. v. Martin, 154 Ky., 349; Owensboro Shovel & Tool Co. v. Monroe, 154 Ky., 431; Knights of Maccabees of the World v. Shields, 162 Ky., 392. In none of these cases was the language more

objectionable than that used by counsel in the present case. Indeed, if a reversal were not ordered in this case, it would be difficult to find a case requiring a new trial because of improper argument.

But the point is made that the improper argument of counsel was not sustained by affidavits, as required by the Code. Section 340, sub-section 2, Civil Code, authorizes a new trial for misconduct of the jury, of the prevailing party, or of his attorney. Section 343 provides in part as follows:

"The grounds mentioned in Section 340, Sub-sections 2, 3 and 7, must be sustained by affidavits showing their truth; and may be controverted by affidavits."

In our opinion, this provision applies in those cases only where the misconduct of the counsel does not take place in the presence of the court, or, taking place in his presence, is the subject of dispute. It does not apply to improper argument taking place in the court's presence about which there is no dispute and to the happening of which the court certifies in the bill of exceptions. In the present case the improper argument is set forth in the bill of exceptions and certified to by the court. This practice has always been regarded as sufficient. Bannon v. Louisville Trust Company, Admr., 150 Ky., 405; Southern Ry. in Kentucky v. Thacker's Admx., 156 Ky., 486.

Judgment reversed and cause remanded for a new trial consistent with this opinion.