In the Matter of FRANK J. O'NEIL, an Attorney, Respondent.

First Department, January 31, 1930.

*Isidor J. Kresel* [*Leon Leighton* with him on the brief], for the petitioners.

*Hartwell Cabell* of counsel [*Cabell, Ignatius & Lown*, attorneys], for the respondent.

DOWLING, P. J.  The respondent was admitted to practice in the Appellate Division, Fourth Department, in July, 1904.

He was general counsel of the Royal Indemnity Company and until October, 1922, he supervised the details of the legal department.  Between that date and April, 1927, he retained the title of general counsel but did not supervise the legal details, being vice-president of the company, doing executive work.  In April, 1927, he became its president.

The petition herein charges that while he was general counsel or president of the company, its agents or employees, acting pursuant to the instructions and directions of the respondent, and with his knowledge and approval, but without the knowledge or consent of the attorneys for certain claimants, conducted negotiations for settlement of their claims directly with the persons alleged to have been injured, and induced them to accept money in settlement of said claims.

The particular Canons of Professional Ethics of the American Bar Association, as adopted by the State Bar Association, which respondent is claimed to have violated are the following:

" 9. Negotiations with opposite party.  A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel.  It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law."

" 16. Restraining clients from improprieties.  A lawyer should use his best efforts to restrain and to prevent his clients from doing those things which the lawyer himself ought not to do, particularly with reference to their conduct towards Courts, judicial officers, jurors, witnesses and suitors.  If a client persists in such wrong-doing, the lawyer should terminate their relation."

Four cases covering a period of about six years were presented before the referee appointed to hear the charges.  Of these, one occurred while respondent was general counsel of the company, and he was the attorney of record in that case (Bailey v. Seither).  The other three cases occurred while he was president of the company, and the attorney of record was Mr. Barnett Cohen (Reilly v. Ballin; O'Keefe v. Busy Bee; Gesner v. Ruthenberg).  These were all cases of direct settlements with clients.  Respondent denied that he knew anything of the manner or details of the settlements and is corroborated by the company's employees who actually effected the settlements (and are not attorneys), who

testified they never took up the matters with respondent and never received any instructions from him as to these cases. In three of the cases there is no doubt that an attorney had been retained to represent the claimant; there is some question as to whether there had ever been any retainer in the fourth (Gesner) case.

We are of the opinion that respondent, as an attorney, was bound to practice good faith and observe the Canons of Ethics of his profession as fully when he became vice-president or president of the company as when he was its general counsel.

" An attorney engaged in the practice of law should primarily reserve himself for his profession only. In this profession he is held to the highest standard of ethical and moral uprightness and fair dealing. There seems to be no good reason why a lawyer should be allowed to be honest as a lawyer and dishonest as a business man. If he desires to go into business he must take the risk, if any is involved, and must see that his dealings as a business man are as upright as should be his dealings in his professional capacity." (*Matter of Isaacs*, 172 App. Div. 181.) (See, also, *Matter of Dolphin*, 240 N. Y. 89; *Matter of Somerville*, 183 App. Div. 445; *Matter of Goldstein*, 220 id. 107; *Matter of Bullowa*, 223 id. 593.)

Mr. Kline, the superintendent of the Metropolitan claims department, who is not an attorney, testified that he was such superintendent when the last three of the cases came up, and accepted full responsibility therefor and for instructing his men to make these direct settlements, and that they were to miss no settlements. He thought as many as a dozen cases a year were settled directly, but he never reported them to the president. Mr. Dibbs, another superintendent, testified that respondent told him he thought the company had the right to make a settlement directly with a claimant provided there was no contract between him and the attorney and that he should take a statement to that effect and a consent to a discontinuance from plaintiff. Respondent testified on this point: " I * * * told him he was apparently right in his conclusion that he had a right to settle these cases; * * * that apparently he had a perfect right, as a layman, and the company as a company, to settle these cases, but I thought, as a matter of company policy, that the cases should not be settled, except in such cases where he was satisfied that really there wasn't a lawyer in the case, and that in those cases that the files should be fortified with a statement to that effect, or an affidavit to that effect."

Apparently, however, some of the company's employees undertook to determine not only the fact of the retainer of an attorney by the claimant, but also the extent to which such a retainer should

be recognized or respected, if there was a chance to settle the claim for a small amount. Of course they had no such right. Where a claimant had retained an attorney to the knowledge of the company, and particularly if its files disclosed notice of suit brought by such attorney or of the fact of his retainer, no one was entitled to disregard it. And if this record showed that respondent had personal knowledge of an improper practice in that regard, he would be answerable, whether as an attorney who was general counsel to his company, or as an attorney who became president thereof and directed its affairs.

But upon this record we cannot find any evidence whatever that respondent either instructed or directed settlements by agents or employees of his company with claimants in disregard of the rights of their attorneys, or that such settlements were made with his knowledge or approval.

Petitioners' counsel asks us to draw an inference from what has been established by the evidence, that respondent must have known of the practices followed by the agents and employees of his company, and given at least his tacit approval to the same. A continuous line of conduct, followed openly and notoriously and in a substantial percentage of claims submitted, might well give rise to such an inference unfavorable to respondent. But this Royal Company has 5,000 suits and 15,000 claims pressed against it each year. The direct settlements were testified to as numbering as many as a dozen per year. The files in such cases, furnished to the petitioners herein for examination, are variously estimated at from fifteen or twenty, to forty. But, after all, only four cases were relied on by petitioners, and these covered a period of six years. The mere statement of these figures shows the impossibility of holding that any practice grew up or was followed to an extent which would import knowledge upon the part of respondent of its existence.

The conclusions of the learned referee that the respondent was not proven guilty of any unprofessional conduct should, therefore, be confirmed and the proceedings dismissed.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Proceeding dismissed.