## IN THE MATTER OF GEORGE I. ROTHMAN AND DAVID IRVING, JR., ATTORNEYS AT LAW.

Argued March 30, 1953—Decided June 8, 1953.

*Mr. Milton T. Lasher*, by designation of the Ethics and Grievance Committee for Bergen County, argued the cause for the committee.

*Mr. Samuel Kaufman* argued the cause for the respondent David Irving, Jr.

*Mr. Julius E. Kramer* argued the cause for the respondent George I. Rothman.

The opinion of the court was delivered by
VANDERBILT, C. J. This matter comes before us on the return of an order to show cause issued on a presentment filed by the Ethics and Grievance Committee for Bergen County charging the respondents with various violations

of the 27th, 35th and 47th Canons of Professional Ethics. These violations involve (1) extensive advertising and direct solicitation of mortgage business by a corporation owned by the respondents, leading directly and inevitably to the acquisition by them of a very substantial amount of professional employment which they would not have obtained without such advertising and solicitation, in violation of Canon 27; (2) the receipt by the corporation owned by them of substantial legal fees, in violation of Canon 47, forbidding a member of the bar to aid the unauthorized practice of the law by any lay agency, and of Canon 35 prohibiting the intervention of a lay agency between client and lawyer.

## I. THE FACTS

The facts are not in dispute. The background of the respondents is summarized in the respondents' brief as follows:

Irving was admitted to the bar in 1940 after having spent some years in the handling of claims for an insurance company. His partnership for the practice of law with George I. Rothman was formed in 1945. At that time Mr. Irving had an independent clientele wholly unrelated to the mortgage financing or real estate business. His practice consisted of the usual trial work in the negligence and compensation fields and in the handling of industrial relations.

George I. Rothman, his law partner, was interested solely in the real estate and mortgage field where he and his family had wide and extensive experience. When he received his discharge from military service, his home community was in the midst of a great building boom which still continues unabated. Residential housing and industrial and commercial development were in the midst of an unparalleled growth. The mortgage insurance which underlay G. I. loans presented an outstanding opportunity for banks, savings and loans and mortgage lending institutions all over the metropolitan area to assist in the financing of these large building ventures. Rothman determined that his opportunity lay in this area.

In 1946 Rothman took over the trade name of Northern New Jersey Mortgage Associates from Irving's brother and began to develop a mortgage business in the same quarters as the law partnership at 12 Engle Street, Englewood. By 1949 the business had developed to such an extent that they moved to larger quarters at 63 West Palisade Avenue, Englewood, where the partners formed a corporation, Northern New Jersey Mortgage Associates, whereupon the similar trade name was cancelled of record. Where Rothman had previously owned the trade name, each partner then owned 50% of the stock of the corporation. The mortgage business of the corporation was carried on in rooms leased by the partnership. Although Irving then had some clients other than the mortgage company, he devoted most of his time to legal work in connection with the mortgage loans of the corporation and eventually he abandoned practically all of his other law practice. Rothman did not practice law to any extent from 1949 on, but became the president and guiding hand in the mortgage company, the business of which increased tremendously. It had from 45 to 50 mortgage closings a week, and it handled around a quarter of a billion dollars in mortgages in seven years. In 1951 the law partnership had from 15 to 18 employees, while the corporation had another 12 to 20, all in the same offices. Of them six or seven were fieldmen soliciting mortgage business. They had a single telephone number and eventually a 16-line switchboard, for the use of both the law firm and the corporation. In answering calls the operator would answer with the number rather than the name of the firm or of the corporation. The corporation employed two firms of accountants. For a time it had a branch office in Newark and acted as a broker in at least one real estate development in Burlington County.

The business of the mortgage company and the practice of the law firm were conducted as a single intermingled enterprise. Thus, prior to June 30, 1951 the law partnership paid all telephone bills and the salary of the switchboard operator. From July 1, 1951 to June 30, 1952 the mortgage

corporation paid the telephone bills and salary of the switchboard operator. From July 1, 1952 to October 31, 1952 the law partnership again paid the telephone bills and switchboard operator's salary. The law partnership, moreover, paid the entire rent for the premises at 63 W. Palisade Avenue, Englewood, for the years 1949, 1950, 1951 and 1952. From July 1, 1951 to June 30, 1952 the mortgage company paid the partnership rent of $300 a month. Employees were frequently shifted back and forth between the two payrolls. Although Rothman did not practice law during the period from July 1, 1951 to June 30, 1952, yet he shared in all of the profits of the law partnership from 1945 on, including the annual payment from the mortgage company to the law partnership pursuant to the contract agreement mentioned hereafter. Irving, on the other hand, did not engage in the mortgage business, yet as the 50% owner of the stock of the corporation he·was entitled to one-half of its substantial profits. The accountants seldom made any adjustments between the mortgage company and the law partnership. The ownership of the title plant was so uncertain that even Rothman himself could not tell the committee whether the law firm or the mortgage company owns it, as a result of the complete commingling of the business of the mortgage company and the practice of law by the partnership "under one friendly roof," as the mortgage company aptly phrased it in its advertisements.

The mortgage company was paid large amounts by borrowers for legal fees. On July 1, 1951 the mortgage company made a written contract to pay the law partnership $42,000 annually, later reduced· to $33,000, for legal services to be rendered by it. An outstanding instance of the interrelatedness of the two enterprises is found in the fact that *while the agreement was in force the mortgage company received all moneys paid by mortgage borrowers for services including legal fees.* Rothman testified that the law firm also received additional fees besides the $33,000 annual payment. The mortgage company's closing statement form even included an item for.search fees. These fees were considerable.

Rothman testified that on the sale of a house to a G. I. for $15,000 the mortgage company's fees totalled $483. These fees were made up of 1% G. I. discount, recording fees, the cost of the title policy, three months' taxes, the fire insurance premium, a survey and the closing fee of $150. In addition thereto, if the mortgage were a construction mortgage the builder was required to pay a construction mortgage fee of $111. While the contract providing for this annual payment was in force, Rothman received $3,600 and Irving received $2,275 as officers of Northern New Jersey Mortgage Associates for each of the first two quarters of 1952.

Of equal significance is the mortgage company's course in the solicitation of mortgage business. Rothman solicited work for the mortgage company by letters to builders and developers, emphasizing the company's complete and speedy service, always a telling argument with important real estate developers and mortgage borrowers. The salesmen of the mortgage company were instructed to take the same theme of speedy service in their selling efforts. In addition to the solicitation of mortgage business through advertising, letters to builders and through salesmen, the corporation secured 25% of its business from real estate brokers to whom it paid commissions. The company employed several advertising firms and public relations counsel who aided Rothman in the preparation of large newspaper advertisements and press releases extolling the services of the mortgage company in the highest terms. On at least one occasion the mortgage company made a direct payment to a newspaper reporter. On December 6, 1952, even after the hearings in this matter had started before the committee, the mortgage company had three consecutive pages of advertisements and reading matter in the *Bergen Evening Record* announcing the opening of the new offices at 133 Cedar Lane, Teaneck, in a building owned by a corporation of which the respondents are equal one-third stockholders. The advertisements and press releases, which will be discussed later, made it clear that the corporation would furnish complete service to builders, developers, and others. The title facilities and personnel of the

corporation were extolled in the highest terms. A great many news items were released to the daily press, including the *New York Times*, the *New York Herald Tribune*, the *New York Post* and *Telegram* in New York City and newspapers in Newark and Passaic. Such articles appeared once or twice a week for five years. A recurring advertisement was carried in the *Bergen Evening Record* for at least a year. For all of these advertisements, which we will discuss later, Rothman assumes responsibility.

On July 1, 1952 the contract between the mortgage company and the law partnership was abandoned and thereafter the legal fees were paid by the borrowers directly to the partnership. On November 1, 1952 Irving and Rothman dissolved their law partnership. Irving still continues to do the legal work of the mortgage company and to own stock in it, one-half up to November 26, 1952 and one-third since then, when a third stockholder took title to one-third of his and of Rothman's stockholdings, after hearings had commenced before the Ethics and Grievance Committee. At the oral argument before us on the presentment, Irving offered unreservedly to dispose of his stock in the mortgage company and also, if the court insisted, of his stock in the company owning the office building.

Rothman filed no brief in his own behalf, but at the oral argument his counsel "adopted" Irving's brief. Counsel's only excuse for not filing a brief was that he had been in Washington the week before the argument. He stated that Rothman had never read the brief filed by the Committee on Ethics and Grievances for Bergen County, although he had "gone over it" with Rothman. Rothman frequently stated in printed articles, in statements before the committee and through counsel before us that he did not intend to return to the practice of law when he left the armed services, but to engage in the mortgage and real estate business. At one point he testified that if he devoted five percent of his time in 1951 to the practice of law it was a lot, and at another time he said he had not actively engaged in the practice of law during the last five years. Rothman held a real estate

broker's license and was interested in various building corporations that had offices with the mortgage company and the law partnership.

## II. The Controlling Authorities

The controlling authorities in the instant case are the 27th, 35th and 47th Canons of Professional Ethics and the unanimous opinion of this court of less than two years ago in *In the Matter of L. R., an Attorney at Law,* 7 *N. J.* 390 (1951).

The Canons of Professional Ethics of the American Bar Association, with the exception of one amendment not pertinent here, were adopted by *Rule* 1:7–6; they "shall govern the conduct of the judges and the members of the bar of this State." This rule is grounded not only on the rule-making power of the Supreme Court, but on its express jurisdiction over the discipline of members of the bar, *N. J. Const., Art.* VI, *Sec.* II, *par.* 3.

█ The Canons of Professional Ethics undertake to codify in convenient form the traditions and practice that have been recognized over the centuries as part of the common law with respect to the lawyer's obligations to the courts and the administration of justice, to the public and his clients, and to his profession and his fellow practitioners. They are as obligatory on him as if cast in statutory form, as indeed they are in large part in many states.

The three canons referred to relate in one aspect to the lawyer's duties to his profession and his fellow practitioners. If the practice of the law is to remain a profession and not to become a mere trade, it is quite as important that ethical practitioners be protected from unfair competition within the profession as from the unauthorized practice of the law outside the profession by laymen and corporations. But this is not the only aspect of these canons. Their enforcement is of concern not merely to the members of the profession. It is equally essential to the public. Our citizens have a right to expect from the members of a learned profession who are

granted by the State the privilege to practice law that they in return for this privilege will live up to the standards long recognized at common law and in large part codified in the Canons of Professional Ethics.

One has but to read the three canons above referred to to see how directly and immediately they apply to the facts of this case as summarized herein:

"27. ADVERTISING, DIRECT OR INDIRECT. It is unprofessional to solicit professional employment by circulars, advertisements, through touters or by personal communications or interviews not warranted by personal relations. Indirect advertisements for professional employment such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved, the importance of the lawyer's position, and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible; but the customary use of simple professional cards is not improper. * * *

"35. INTERMEDIARIES. The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. * * *

"47. AIDING THE UNAUTHORIZED PRACTICE OF LAW. No lawyer shall permit his professional services, or his name, to be used in aid of, or to make possible, the unauthorized practice of law by any lay agency, personal or corporate."

Nor do we have to look far afield for a judicial application of these canons to the facts of the pending case, for in *In re L. R. supra,* we dealt with a similar situation, the chief differences being (1) that in that case the business was relatively small, (2) but there the unprofessional scheme was nipped in the bud, whereas here the business ran to "more than a quarter of a billion dollars worth of loans since 1945," to quote one of the mortgage company's advertisements, and has been carried on for seven years, the last two years in the face of the decision of this court in *In re L. R.,* and (3) that the methods of the respondents here were somewhat more

subtle but no less effective in getting business than were those of L. R.

In the earlier case the respondent operated a realty corporation under his family name. Agents of his corporation informed prospective customers that the corporation would obtain the desired mortgage, make the title search, prepare all the legal papers, and do everything necessary to close the transaction and that, the respondent being a lawyer himself, it was not necessary for the customer to engage his own lawyer, although he might do so if he desired. The respondent paid for complimentary press notices, featuring biographical sketches of himself and including his photograph, emphasizing the corporation's volume of business and growing staff, and broadcasting that "the firm has a 1-package system which includes servicing a transaction from its inception to its closing. The corporation has its own legal department which processes and expedites every mortgage applied for through the office." We there held that:

"The practice which has been referred to as 'a one-package system' is a system whereby commercial services, including a lawyer's fee, are rendered to a person for a single charge. This throws the practice of law into a commercial atmosphere which is wholly foreign to the concept of a correct practice and which has been soundly condemned. *Stack v. P. G. Garage, Inc.*, 7 N. J. 118, [decided May 7, 1951]; *In the Matter of A. B. C., an attorney and counselor at law* [7 N. J. 388, decided June 4, 1951]."

The similarity between the facts in the earlier case and the facts in the pending case is striking, except that the violations here proved are far more extensive in amount, in the length of time pursued and in subtlety than they were in the earlier case, and also in willfulness in flaunting the clear-cut declarations of *In re L. R.* In the earlier case L. R. operated a realty corporation in his family name, while here a trade name totally unrelated to either party was purchased by the respondents from a brother of one of them. L. R. testified that he telephoned his complimentary press notices to the newspaper and did not concern himself with making any corrections thereof. Here the respondent Rothman either

wrote the press notices or had them written for him by publicity men or public relations counsel and sent them to the newspaper, while the respondent Irving never disclaimed any of the benefits proceeding therefrom. Neither took any steps to curb the advertising or press notices or to renounce any statements contained therein. While L. R. advertised the unusual facilities of his title plant, quick service and a one-package deal, the mortgage company here even after the decision in *In re L. R.* continued to advertise the unusual facilities of its title plant and quick service "under one friendly roof," its equivalent of L. R.'s one-package deal. As far as the customer was concerned, everything was being done for him by the mortgage company. He saw a mortgage company and a law firm whose physical set-up and work were so intertwined that it was impossible to separate them. Rothman himself could not satisfactorily explain the arrangement between the corporation and the law firm under the contract dated July 1, 1951, whereby the law firm agreed to provide legal closing services for all real estate and mortgage transactions negotiated by Northern New Jersey Mortgage Associates. Still further proof, if any be needed, of the fusion of the respondents' professional and corporate interests may be found in Irving's explanation of his rental agreement in the new building in Teaneck:

"Q. What is the gist of the agreement? A. Well, on what I can afford to pay on the income that I will derive. I haven't arrived at a common denominator yet."

The two cases have these salient points in common: (1) The use of extensive, extravagant advertising by a corporation owned by lawyers to produce a large volume of law business which they would otherwise not have obtained, and (2) the carrying on of the work of the corporation and of the law business as a single interrelated unit.

There is little difference between the advertising done in *In re L. R.* and here except that here the advertising was done on a much greater scale. The attorney in the earlier

case frankly advertised his one-package deal. Here the respondents just as effectively advertised their one-package deal "under one friendly roof" through their salesmen and also through newspaper advertising, through their common telephone and their commingled law and mortgage office. A glance at a few newspaper advertisements and articles, all admittedly printed at the instigation of Rothman and without repudiation by Irving, reveals a continual program of publicity for the company's efficient and quick service in handling mortgage loans. In addition we find many laudatory articles concerning Rothman, in many of which his background as an attorney is mentioned. Such advertising continued, even after the complaint was filed by the Ethics and Grievance Committee. Thus on November 8, 1952, there appeared on the first page of the real estate and building section of the *Bergen Evening Record* a large article headlined "Business Volume Hits New High, Sets Theme for Firm Expansion." This article gives a summary of a statement by Rothman to the effect that he attributes the mortgage company's success to the "specialized service for builders and technical current knowledge to do the job correctly," as well as a "complete technical requirement aspects of conventional and Governmental financing, including application procedure in accordance with Government regulation, preliminary requirements of local and Government authorities, and procedure to insure a fast and successful moving project." Such self-praise is, of course, a clear violation of Canon 27.

The three pages of advertisements and articles in the *Bergen Evening Record* for December 6, 1952, are especially significant in view of the fact that at that time the charges here under review had been made by the Ethics and Grievance Committee for Bergen County and the hearings before it were under way. The articles are devoted largely to an enumeration of Rothman's accomplishments. The first page carries two photographs of the new office in Teaneck, New Jersey, one of the outside of the building and the other of the title and mortgage analysis department. There is also an advertisement for the company in which is a sketch of the

new office building. It mentions the "complete facilities" of the company and further provides "Time Saved . . . Expense Avoided—Loans are expedited, and expense avoided, by our knowledge of the requirements of the various government loan agencies." There is a two-column spread giving a history of the firm with a biographical sketch of and a laudatory article on Rothman. The article states that Rothman is an attorney, a graduate of Columbia University and Newark Law School, and that:

"Unwilling to go back to his law practice when he was handed his service discharge, Rothman scanned the field for new opportunities. He finally chose the mortgage business, deciding that his legal background, plus a knowledge of the maze of new Government regulations for veterans and nonveterans fitted him for that field."

The article further provides:

"Success and growth of the firm is attributed by Rothman to key personnel, availability of funds even during the most stringent periods, technical know-how, and competent service. * * *

Another ambitious undertaking of the company has been its investments in the ability of a number of young energetic builders who had the experience to go along with their ambitions. The firm backed a number of these builders financially, Rothman said, and today several are included in the State's top echelon in the construction field."

On the second page, headlined "Rothman Sees His Dream Come True," appear several pictures of the new offices, as well as a photograph of Rothman. Another article on Rothman states:

"From Columbia Rothman went to New Jersey Law School, graduating in 1939 and passing his bar examination. Then after a brief period at practicing law, Rothman went into the service. * * *

While in the service he decided to make a phase of the real estate business his career. He formed Northern New Jersey Mortgage Associates in November, 1945 after receiving his discharge from the service, and opened an office on Engle Street in Englewood."

On the same page an advertisement states, among other things:

"Title and Analysis Depts.
Providing a service that helps to assure quick action on loan applications. Title Dept. files contain thousands of detailed maps for quick reference."

The third page has a picture of the new Modernization Loan Department of the Mortgage Company, another picture of Rothman, and a photograph of the Title Closing Room. There are also two more articles. One states:

"The youthful executive attributes the firm's success in this department to its specialized service for builders and technical knowledge to do the job correctly.
The department offers builders such services as character-zoning, availability of land, information on price fields in varied types of construction for particular sections and areas, house designs best suited for sale and mortgage purposes, complete technical requirement aspects of conventional and Governmental financing, including application procedure in accordance with Government regulation, preliminary requirements of local and Government authorities, and procedure to insure a fast and successful moving project. * * *
'We expect to continue to supply this fine service from our new building,' says Rothman, 'with our entire organization ready to serve builders, brokers, and modernization dealers and contractors.' "

The other provides:

"The company's Title Departments are headed by Garrett Cooper of Clifton and Reginald Dugdale of Totowa. Cooper, who has been in the title business for 25 years, is title officer for used construction; while Dugdale is title officer for new construction. Both men have large staffs working in their departments."

These advertisements and accompanying articles, after charges made and with hearing under way and pending, are patently inconsistent with the assertions of good faith and protestations of innocence made by the respondents. They did nothing that would interfere with their business enterprise and they obviously resolved all doubts in their own favor and against the Canons of Professional Ethics, notwithstand-

ing the fact that they must have been conscious of their precarious position.

Advertising by any professional man inevitably involves self-praise and puffing. If competitive advertising among lawyers were permitted, the conscientious, ethical practitioner would be inescapably at the mercy of the braggart. An advertisement of the Northern New Jersey Mortgage Associates of September 13, 1952, in the *Bergen Evening Record* graphically illustrates this evil. The article quotes Rothman:

"According to the mortgage firm's president, his firm has been able to close more than a quarter billion dollars worth of loans since 1945 when N. N. J. M. A. was first organized in Englewood. Now regarded as one of the major finance companies in the East the Englewood firm is continuing its ambitious program of expansion with construction of a 3-story building on Cedar Lane and Red Road, Teaneck. * * *

It will have approximately 48 offices *with facilities to employ more than 175 persons.*" (Emphasis supplied)

Again in the *Bergen Evening Record* for December 6, 1952, also while the hearings were pending, a press release appeared in a special box as follows:

"Firm's Success Story Revealed By its Figures

Teaneck: Northern New Jersey Mortgage Associates, which celebrated its seventh anniversary last month, has financed over 20,000 new homes, multi-family dwellings, commercial and industrial units for a total of $250 million.

The Company also financed over 12,000 existing homes for the same period with a total mortgage volume of $14 million."

The advertisements in the various exhibits in the case are replete with similar statements of which the foregoing are merely samples.

The publicity program of the respondents through direct advertisements and indirect advertisements thinly disguised as newspaper articles, the direct solicitation of business by salesmen in the field, and the commissions paid real estate brokers combine to produce a tremendous volume of professional legal employment that makes the more familiar offenses of ambulance chasing and the operating of collection

agencies as a facade for obtaining law work look picayune and amateurish indeed.

In defense it is urged that the advertising was designed solely to promote the business of the mortgage company and not to produce law business. It is the nature of a mortgage business that it inevitably produces law business on each mortgage transaction. That the volume of the law business was substantial is revealed in the number of employees of each; as we have seen, the law partnership had from 15 to 18 employees, while the corporation had from 12 to 20, all operating out of the same offices.

There are other important points in which the respondents here went far beyond L. R. in violating Canons 35 and 47. L. R. billed for and was paid fees for his legal services. Here for a full year the mortgage company received the fees paid it by its customers and paid the law partnership a flat retainer in clear violation of both Canons 35 and 47. We shall have occasion to refer again to his practice later on in dealing with the specific defenses urged by the defendants. On the other hand, even though he did no legal work, throughout the entire period of the partnership, Rothman shared in the profits, obviously as a reward for turning over to the partnership the law business of the mortgage company. It is urged that in performing the legal work in connection with a mortgage loan the law firm was acting for the financial institutions, such as banks and insurance companies, rather than the mortgage company. This, however, is not so for Rothman makes much of the point that in many cases the mortgage company itself made the mortgage loan and later sold the mortgages to various financial institutions. But even where the mortgage was taken directly by a financial institution it was the mortgage company as broker that controlled where the legal business should go.

It remains to consider the defenses urged by each of the respondents. The respondent Irving in his brief and in the oral argument in his behalf cited no authorities whatsoever but made four general arguments by way of defense or in mitigation of discipline, none of which has any validity.

First, it was urged that Irving is in the same position as an attorney for a savings and loan association or of a bank or trust company in passing on a mortgage loan. But a savings and loan association is a mutual institution; it is not owned by its attorneys but by its stockholders. Nor is a bank or trust company in the usual case so owned by an attorney or group of attorneys; if it were, and if it were used as a mortgage company was used here and its business were commingled with that of the law office, its conduct would be equally offensive. But such a situation is impossible, not only with a bank or trust company, but also with a savings and loan association by reason of many factors, including the official supervision of its activities, which of course does not exist in the case of the defendants' mortgage company incorporated under the General Corporation Act.

Second, it is argued that after the publication of *In re L. R.*, a case originating in Englewood where the respondents had their law offices until recently, the respondents took legal advice of several lawyers and sought to conform to their opinions as to the meaning of *In re L. R.* The proofs on this point are not only fatally defective, but they throw grave doubt on the good faith of the respondents in presenting their defense. Not a single written opinion is produced from any member of the bar. Not a single lawyer was put on the stand to testify to the opinion he is alleged to have given to the respondents. There is no testimony as to what facts were related to each lawyer allegedly consulted on which he might base his opinion. There is no testimony as to what the opinion of each of these lawyers was or what changes he recommended to the respondents in their operation to conform to the decision in *In re L. R.* If such opinions were given at all, they were "curbstone opinions" and worth no more than such opinions traditionally are. All that the testimony with respect to such opinions serves to do is to reveal the doubts that were existing in the minds of the respondents as to the propriety of their scheme of operations.

██ None of the attorneys who are alleged to have given advice to the respondents were called as witnesses by the

respondents and their testimony in this respect is entirely without corroboration. In this view of the facts we are not required to pass on the question of the efficacy of the advice of counsel, save to remark that this is not a suit for malicious prosecution and it is therefore difficult to perceive how the advice of counsel has any bearing upon the matter. A layman cannot excuse a violation of the law by saying that he acted on the advice of counsel, and there would appear to be no sound reason for extending such an immunity to an attorney charged with unethical conduct. Were the rule otherwise, a more effective means of circumventing the Canons of Professional Ethics could hardly be devised. Even more troublesome is the fact that the record shows that the respondents did not make the slightest effort to conform to *In re L. R.*; on the contrary, they continued their soliciting and their advertising on an enlarged scale even after proceedings were commenced against them. It is important at this point to note the chronology. *In re L. R.* was decided on June 25, 1951. On July 1, 1951, six days later, the contract hereinbefore mentioned between the law partnership and the mortgage company was entered into whereby all legal fees were paid by the borrowers to the mortgage company, and the mortgage company paid a fixed annual sum, first of $42,000, later reduced to $33,000, to the law firm. It is impossible for us to comprehend how this can be taken as compliance with the ruling laid down in *In re L. R.* in which the pertinent canons, as here, were quoted at length.

Third, it is argued that there are other lawyers in the State, and especially in Bergen County, who are guilty of the same offenses. This is, of course, no defense; it merely furnishes the information for the institution of disciplinary action against the offenders.

Finally, it is urged in behalf of the respondent Irving that if he were guilty of the offenses charged, they were cured by the dissolution of the partnership on November 1, 1952. Passing over the question of whether the dissolution of the partnership was the result of the pending proceedings or rumors thereof, it is quite clear that the present set-up is a

violation of all three canons. The mortgage company, of which Irving is still a one-third stockholder, is still advertising and still soliciting business by exactly the same methods as before. The business of Irving as a lawyer and the business of the mortgage company are still intermingled. For example, Irving testified that he did not yet know what his rent would be, even though he is a one-third owner of the corporation. Nor is it to be overlooked that Irving owes his present legal business to his long continued violations of the three canons relied on herein.

The respondent Rothman, as we have said, filed no brief but at the oral argument "adopted" the brief filed in behalf of Irving, which had no special applicability to the case of Rothman. At the oral argument Rothman's counsel took the position that while Rothman was not practicing law, he was not bound by the Canons of Professional Ethics although still a member of the bar. It is not difficult to imagine the results which would flow from the acceptance of such a novel doctrine. Fortunately for the profession and the public alike, it has not been and is not now the law. Obligations of the lawyer are binding upon him as long as he remains admitted to the bar. The fact that an attorney is no longer practicing law does not relieve him of the responsibility of living up to the Canons of Ethics. In *In re O'Neil*, 228 *App. Div.* 129, 239 *N. Y. S.* 297, 299 (*App. Div.* 1930), the court stated:

"We are of the opinion that respondent, as an attorney, was bound to practice good faith and observe the canons of ethics of his profession as fully when he became vice president or president of the [insurance] company as when he was its general counsel."

Rothman has gambled for large stakes in business and has won them, but by reason of his blatent flaunting of the Canons of Professional Ethics it should be at the expense of his right to practice law. There is scarcely a phrase in Canon 27 that he has not deliberately and over a long period of years consistently violated, by soliciting "professional employment, by circulars, advertisements, through touters or by personal

communications or interviews not warranted by personal relations." He has disregarded the admonition that "indirect advertisements for professional employment such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved [here a quarter of a billion dollars worth of mortgages], the importance of the lawyer's position and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible." He has set up a corporation between the customers he solicited and the former law firm originally and the respondent Irving now, and he has permitted the corporation to collect legal fees from these customers where the real work was done by the law firm or by Irving. Irving likewise has been a party to all of these matters and, with Rothman, has made possible the unauthorized practice of the law by their mortgage company.

Both respondents are clearly guilty of violating the 27th, the 35th, and 47th Canons of Professional Ethics.

### III. Supporting Authorities

Although we deem the cited canons and decisions in this State controlling, in view, first, of the division in the court and, secondly, of the importance to the profession of the issues raised, it seems desirable to supplement these authorities by reference, without attempting to be exhaustive, to pertinent decisions in other states, to the interpretation of the canons by authorized committees of the bar, to the practice set up in codes of conduct entered into by the bar with various related callings, and to legal writers on the subject. It should be noted at the outset that relatively few cases concerning the canons reach the courts, first, because the canons are clear and, secondly, because the bar in general respects them. It is only where the necessities are overwhelming or the stakes great that a lawyer in his right senses is tempted to violate them.

█ The Canons of Professional Ethics are based on the fundamental premise that the practice of law is a profession and not a business. It is a profession notwithstanding the fact that lawyers make a living out of their practice. Dean Roscoe Pound has with his customary clarity set forth the fundamental characteristic of a profession:

"What we mean by the term profession when we speak of the old recognized professions (medicine, the law, ministry). We mean an organized calling in which men pursue a learned art and are united in the pursuit of it as a public service—as I have said, no less a public service because they may make a livelihood thereby. Here, from the professional standpoint there are three essential ideas—organization, learning, and a spirit of public service. The gaining of a livelihood is not a professional consideration. Indeed, the professional spirit, the spirit of a public service, constantly curbs the urge of that instinct." (Address before Nebraska State Bar Association, October 20, 1949, p. 2.)

Dean John H. Wigmore has stressed the fact that a profession involves a way of living and therefore the canons are much more than rules of ethics:

"For lawyers, the most important truth about the law is that it is a profession. * * * As a profession, the law must be thought of as ignoring commercial standards of success—as possessing special duties to serve the state's justice—and as an applied science requiring scientific training.

And, if it is thus set apart as a profession, it must have traditions and tenets of its own, which are to be mastered and lived up to. This living spirit of the profession, which limits yet uplifts it as a livelihood, has been customarily known by the vague term 'legal ethics.' There is much more to it than rules of ethics. There is a whole atmosphere of life's behavior. What is signified is all the learning about the traditions of behavior that mark off and emphasize the legal profession as a guild of public officers. And the apprentice must hope and expect to make full acquaintance with this body of traditions, as his manual of equipment, without which he cannot do his part to keep the law on the level of a profession." (Foreword to Carter's, *The Ethics of the Legal Profession*, 1915)

█ The result of these considerations on the lawyer is epitomized by Chief Judge Cardozo with characteristic felicity: "Membership in the bar is a privilege burdened

with conditions," *People ex rel. Karlin v. Culkin*, 248 *N. Y.* 465, 467, 162 *N. E.* 487, 489, 60 *A. L. R.* 851 (*Ct. App.* 1928). Many of these conditions are set forth in the Canons of Professional Ethics.

Our best courts have consistently adhered to these principles. Thus in *In re Disbarment of Tracy*, 197 *Minn.* 35, 38, 266 *N. W.* 88, 91, 267 *N. W.* 142 (1936), the Minnesota Supreme Court stated:

> "The point is in the fundamental difference between any commercial business and a profession. The vocation of a lawyer is a profession. * * * his conduct * * * is to be measured not by the indefinite, still developing and largely unwritten standards of trade and counting house, but by those of his profession which, while they have not reached their ultimate state, have yet attained the development and degree of formulation evidenced by the Canons of Ethics."

No infringements of the canons, other than those involving sheer dishonesty, have called forth stronger judicial and professional denunciation than violations of Canon 27 prohibiting advertising and soliciting. In *In re Cohen*, 261 *Mass.* 484, 486, 159 *N. E.* 495, 497, 55 *A. L. R.* 1309 (1928), the Supreme Judicial Court of Massachusetts in a case involving a lawyer who advertised for business stated:

> "The foundation on which this principle of conduct rests is that attorneys at law practice a profession; they do not conduct a trade. It is incompatible with the maintenance of correct professional standards to employ commercial methods of attracting patronage. Advertising such as that disclosed on this record is commonly designed to stimulate public thought and challenge popular attention to the end that the business of the advertiser may be increased. * * * Whatever may be his constitutional rights, a member of the bar must conduct himself as an officer of the court in such manner as not to offend against reasonable rules of propriety established by the court for the general welfare. Courts are solicitous for the rights of one duly admitted to practice law. * * * They owe an equal duty to see to it that the public interests are conserved by observance on the part of lawyers of proprieties indicative of a due appreciation of their responsibilities to the court and to the community, even though purely selfish tendencies and profit may be thereby restrained."

The courts of New York have been equally emphatic. In *In re Schwarz*, 175 *App. Div.* 335, 339, 161 *N. Y. S.* 1079, 1083 (*App. Div.* 1916), the court, in dealing with an attorney who had by the use of letters, circulars and newspaper advertisements solicited patronage for his collection business, said:

"They are typical of modern advertising business methods, and would be appropriate to the exploitation of patent medicines or other proprietary articles, but are utterly abhorrent to professional notions or standards. Unless the ancient and honorable profession of the law, whose practitioners are officers of the court of the highest fiduciary character, under obligations of service to the state, to the community, and to the court, is to be degraded to the rank of a quack medicine business enterprise, the advertising and business solicitation methods here under review must be emphatically and absolutely condemned. * * *

It is precisely because of the 'business' emphasis which the respondent attaches to his professional title of attorney and counselor at law that his methods and practices are so offensive. * * *

The court has no disciplinary supervision of business enterprises. It has jurisdiction over its own officers, and is authorized to discipline any attorney who is guilty of professional misconduct. We are of the opinion that by using the methods, letters, circulars, and advertisements here under consideration the respondent is guilty of professional misconduct. If respondent wishes to retain and carry on the business which he claims is so valuable to him, he may do so outside of the profession whose standards and rules of conduct he has violated; he cannot remain a member of the bar of this state, and, while such member, indulge in such practices."

The same attorney was later disbarred in *In re Schwarz*, 195 *App. Div.* 194, 197, 186 *N. Y. S.* 535, 538 (*App. Div.* 1921), affirmed 231 *N. Y.* 642, 132 *N. E.* 921 (*Ct. App.* 1921), the court adopting the opinion below which contained these pertinent observations:

"It is evident that the respondent has no conception of the ethics of the profession, and is obsessed by the notion that self-advertisement is a proper means of obtaining professional employment, and that his efforts are directed to so shaping his letters and circulars as to obtain the results of such advertisement and at the same time escape judicial condemnation. He had fair warning, but has deliberately violated the spirit of our former decision, while asserting that he has observed its letter. The court told him plainly

that if he wished to continue his business, for that is what he then claimed it was, in the manner and by the methods employed, he must do it as a business man, and not masquerade as a professional man, while violating the fundamental ideals and principles of the profession."

The opinions of the Committee on Professional Ethics and Grievances of the American Bar Association are equally explicit, *e. g.*, in Opinion No. 62, dated March 19, 1932, the committee was concerned with the application of Canon 27 to an attorney's acquiescence in a newspaper's repeated publication of laudatory announcements regarding him and his legal practice. In its opinion the committee stated:

"The assumptions in questions one and two stretch credulity almost to the breaking point. The facts stated in the preamble clearly disclose improper advertising of the most flagrant nature. We cannot believe that the newspaper's repeated publication of the attorney's picture and announcement could have occurred without his request or consent. But if it be true that such publication has been made as suggested in question one, nevertheless, it was the duty of the lawyer, as soon as his attention was called thereto, to request and require the publisher to discontinue publication of the article. The failure so to do would permit him to be 'advertised' by indirection contrary to the provisions of Canon 27. Such advertising we disapprove." (*Opinions of the Committee on Professional Ethics and Grievances* (1946), *pp.* 156-157)

To the same effect is Opinion No. 44-2 of the Committee on Professional Ethics of the Chicago Bar Association:

"It is the opinion of the Committee that such advertising, whether it mentions the attorney or not, if it is with his knowledge or consent, or if he participates in the results of such solicitation, constitutes a violation of Canon 27 'Advertising, Direct or Indirect.' "

Violations of Canon 27 concerning advertising and soliciting are likely to be interwoven, as here, with violations of Canons 35 and 47 dealing with intermediaries and aiding in the unauthorized practice of the law. Thus, Opinion No. 122, dated December 14, 1934, of the Committee on Professional Ethics and Grievances of the American Bar Association states:

"There never could have arisen in this country any widespread lay practice of the law without the assistance (and we may say the suggestion and inventive genius) of intelligent, but highly unprofessional lawyers. It may fairly be said now that no lawyer can urge unfamiliarity either with the ethical or legal improprieties of such misconduct. It must cease or be stopped by the activities of the organized profession. Drastic action should hereafter be taken against any lawyer participating therein."

See also Opinion No. 31 of the committee, dated March 2, 1931, in which it was said:

"In our opinion, it is improper for an attorney to aid a corporation to practice law, or in any way to participate in or sanction such practice, and it is, therefore, improper for him to allow his name to be displayed on the letterheads or advertising matter of such a corporation. Furthermore, the solicitation of 'law practice' is contrary to Canon 27, not only when it is done by the lawyer but also when he acquiesces in the use of his name in connection with such solicitation by others.

The conclusion would not be different if he were a full time salaried officer of a corporation soliciting 'law practice.' An attorney may properly, for a salary, devote his entire time to the performance of legal services for a corporation, provided the legal services performed concern only the corporation's own affairs, but when he allows it to sell his professional services, he violates Canon 35."

The decisions are to the same effect. *In re Tuthill*, 256 *App. Div.* 539, 10 *N. Y. S. 2d* 643, 649 (*App. Div.* 1939), was a disciplinary action under Canon 35 in which an attorney for one of the so-called "heir hunting" companies was disbarred. The corporation had been found to be engaged in the unlawful practice of law. The respondent-attorney advised the formation of a New Jersey corporation to evade criminal prosecution in New York and otherwise aided the corporation in its unlawful practice of law. In its opinion the court stated:

"The record leaves no doubt that respondent was aware of the fact that the corporation obtained its business through solicitation. As an attorney, respondent himself could not so solicit. In accepting engagements from the corporation, respondent was doing indirectly what he could not ethically do directly. * * *

"The relationship of attorney and client did not exist between respondent and those for whom he appeared as attorney of record.

He was, in reality, the attorney for the corporation which selected and employed him, to which he accounted and which fixed his compensation.

"He wholly disregarded the 35th Canon of Professional Ethics of the American Bar Association * * *."

Here the mortgage company was engaging in the unauthorized practice of law and the respondents permitted their services and names to be used in aid thereof, contrary to Canon 47. *Hexter Title & Abstract Co. v. Grievance Committee*, 142 *Tex.* 506, 179 *S. W. 2d* 946, 951 (*Sup. Ct.* 1944), where the title company was adjudged guilty of the unlawful practice of law contrary to statute is pertinent. The Supreme Court of Texas in affirming said:

"According to the facts set out in the agreed statement, and particularly paragraph 3 thereof, the defendant draws deeds, notes, mortgages, and releases relating to the property rights of others.

According to paragraph 2 of the stipulation it has been furnishing opinions as to the condition of the title to real estate, and according to paragraphs 7 and 8 it holds itself out as possessing authority to render such services, and advises interested parties as to the purpose and legal effect of the instruments drawn by it. It therefore advises others as to the secular law, and draws deeds and other papers relating to secular rights within the inhibition of the above statute. These acts, when performed for a consideration, constitute the practice of law, both within the terms of the statute above referred to and the decisions of the courts on the subject."

These canons do not, however, preclude an attorney from engaging in all business. The line of demarcation is clearly indicated in Opinion No. 57 of the Committee on Professional Ethics of the American Bar Association, dated March 19, 1932, which provides in part:

"*It is not necessarily improper for an attorney to engage in a business; but impropriety arises when the business is of such a nature or is conducted in such a manner as to be inconsistent with the lawyer's duties as a member of the Bar. Such an inconsistency arises when the business is one that will readily lend itself as a means for procuring professional employment for him, is such that it can be used as a cloak for indirect solicitation on his behalf, or is of a nature that, if handled by a lawyer, would be regarded as the practice of law. To avoid such inconsistencies it is always desirable and usually necessary that the lawyer keep any business in*

*which he is engaged entirely separate and apart from his practice of the law and he must, in any event, conduct it with due observance of the standards of conduct required of him as a lawyer.* (Emphasis supplied)

Some businesses in which laymen engage are so closely associated with the practice of law that their solicitation of business may readily become a means of indirect solicitation of business for any lawyer that is associated with them. * * *

For the reasons stated a lawyer cannot properly devote a portion of his time to managing a bureau for the adjustment of insurance claims nor permit his name to be used on its stationery. Having thus answered the first and third questions in the negative, it is unnecessary to answer the second question. Nevertheless, reference to it is desirable because it so aptly illustrates the necessity of keeping any business in which a lawyer may be engaged entirely separate and apart from his practice of law. If such a business and his law practice should be conducted from the same office, the public could not be expected to distinguish between his dual capacities and know when he is acting in the capacity of a lawyer and when in that of a layman."

This problem is further elaborated by Henry S. Drinker in his forthcoming *Legal Ethics* :

"There is, of course, nothing in the Canons to prevent this as to an *occupation entirely distinct from and unrelated to his law practice.* Thus, no one would dispute the right of a lawyer to be a teacher, or a violinist or doctor or a farmer, or to sell rare postage stamps, provided he in no way used such occupation to advertise, or as a feeder to his law practice.

As a Michigan Committee aptly said in a recent case :

'There is, of course, nothing to prevent a lawyer from adding to his general qualifications by becoming a certified public accountant and using his added skill in appropriate matters as they arise. It is only when the lawyer seeks to publicize the fact that he is also an accountant that the question arises.' (Mich. op. 124)

*Much, of course, depends on the surrounding circumstances. In small communities where everyone knows what everyone else is doing, and where there is comparatively little remunerative law practice, it is quite the usual thing for lawyers to be engaged in collateral occupations such as licensed broker or insurance agent. If they do so using distinct letterheads and not using the other occupation as a means of solicitation or securing employment as a lawyer, it is not considered improper.*

Thus a lawyer may properly conduct an independent real estate business in another county (heretofore unpublished op. 38 of A. B. A. Com. now published in App. A), or may offer to manage an apartment house in exchange for the use of an apartment (N. Y. City ops. 344, 475) or may publish a newspaper and write editorials,

but not to exploit himself as a lawyer (heretofore unpublished op. 37 of the A. B. A. Com.) or may be the salaried trust officer of a bank (N. Y. County op. 267).

Where, however, the second occupation, although theoretically and professedly distinct, is one closely related to the practice of law, and one which normally involves the solution of what are essentially legal problems, it is inevitable that, in conducting it, the lawyer will be confronted with situations where, if not technically, at least in substance he will violate the spirit of the Canons (N. Y. City op. 767, income tax service for lawyers), particularly that precluding advertising and solicitation. The likelihood of this is the greatest when the collateral business is one which, when engaged in by a lawyer, constitutes the practice of law (A. B. A. ops. 31, 35, 57, 194, 201, 225, 257, 272; N. Y. City op. 413) and when it is conducted *from his law office*. (Heretofore unpublished op. 43 of A. B. A. Com.) Thus there is apparently no doubt as to the impropriety of conducting, from the same office, a supposedly distinct and independent business of collection agent (N. Y. County op. 260 and ops. cited; N. Y. City ops. 211, 633; N. Y. City ops. 102, 479), stock broker (heretofore unpublished op. 39 of A. B. A. Com.), estate planning (heretofore unpublished op. 43 of A. B. A. Com.), insurance adjusters bureau (heretofore unpublished op. 57 of A. B. A. Com.), tax consultant (A. B. A. op. 57), *or mortgage service* (N. Y. County op. 344; N. Y. City op. B-106) or to organize and operate under a trade name, even though in an adjacent office, a corporation conducting servicing business—drafting charters and other corporate papers (N. Y. City op. 768; heretofore unpublished op. 77 of A. B. A. Com.). Clearly a lawyer may not use his legal stationery to solicit business in the collateral line (N. Y. City op. 636)."

These obvious distinctions are applied by the American Bar Association Committee in Opinion 225 to collection agencies, in Opinion 272 to certified public accountants, and in *Librarian v. State Bar*, 21 *Cal.* 2*d* 862, 863, 136 *P.* 2*d* 321, 323 (*Sup. Ct.* 1943), to an attorney who publicized himself as notary public and tax expert, though not as attorney, although signs on his office showed he was an attorney, where the court held:

"If the petitioner should choose to continue as a practitioner at the bar of this state, he must comply with the standards of the legal profession. He should appreciate that when he is licensed to practice as an attorney at law, the professional services that he thus performs are performed by him as an attorney, whether or not some of the services could also be rendered by one licensed in a different profession. One who is licensed to practice as an attorney

in this state must conform to the professional standards in whatever capacity he may be acting in a particular matter. *Jacobs v. State. Bar*, 219 *Cal.* 59, 25 *P. 2d* 401. As a practicing attorney, he may not solicit employment nor may he advertise contrary to the rules. The restrictions, limitations, and permissible conduct in those respects are familiar both to the lawyer and to the layman."

These authorities clearly define the line between the permissible business activities of a lawyer and those which violate the Canons of Professional Ethics. They do not interfere with the customary methods of practicing law. They are aimed only at the sharp practice of a relatively few members of the bar who are seeking to invade the plain intent of the canons to their own personal financial advantage. The first sign of any such intent is likely to be extravagant, extensive advertising, a field in which they have no competitors. The second sign is apt to be the intermingling of the practice of law with the operation of some business that directly and necessarily produces legal work in large volume. Such a set-up, which must be condemned if the canons are not to become a dead letter in protecting legitimate practitioners, is far removed from service as a director or officer of a bank, a savings and loan association or of an ordinary manufacturing or merchandising establishment, or acting as a real estate or insurance broker and the difference is not merely one of degree but it is a difference in intent and methods.

The New Jersey State Bar Association, like many other bar associations, has sought to protect the profession and likewise the public by entering into codes with related callings. Thus its code with the collection agencies contains the following:

"3. It is held to be improper for an agency to solicit claims for any purpose at the instigation of any attorney."

"5. It is held to be improper for an agency to communicate with debtors in the name of an attorney or upon the stationery of any attorney, or to prepare any forms of instrument which only attorneys are authorized to prepare."

"8. In the forwarding of claims to a lawyer for collection, an agency shall not intervene between the creditor and attorney in any manner which would exploit the services of the attorney or which would direct those services in the interest of the agency, and shall

disclose to the attorney the service charge made by the agency to the creditor if such service charge is greater than the Commercial Law League of America minimum rates. If the attorney corresponds directly with the creditor, the agency may request that copies of such correspondence be sent to the agency."

"9. It is held to be improper for an agency to demand or obtain in any manner a share of the proper compensation for services performed by an attorney in collecting a claim or any legal proceedings upon or arising out of such claim, irrespective of whether or not the agency may have previously attempted collection thereof."

The same respect for the rules here laid down is also reflected in the "Statement of Principles Applicable to Corporate Fiduciaries and Members of the Bar," which statement has been approved by the New Jersey Bankers Association, where we find the following provisions:

"5. A corporate fiduciary shall not, directly or indirectly, influence the employment by the prospective testator of any specified attorney at law for the preparation of any will or codicil under which it is to be appointed in any fiduciary capacity."

"17. A corporate fiduciary shall not extend by advertisement, or otherwise, an invitation to the public to 'bring its legal problems to the fiduciary' or hold itself out as prepared to give legal advice or legal service or to practice law."

"18. A corporate fiduciary shall not advertise that it will, or that, through the services of its officers, agents or attorneys, it will draft or prepare or assist in the drafting or preparation of any will, codicil, trust agreement, contract or other legal document."

The corporate fiduciaries of this State have recognized the evils in such a situation and voluntarily entered into a code prohibiting such practices on their part. The question of legal services is absolutely divorced from all their advertising, and in fact they are to maintain a hands-off policy when it comes to the question of recommending an attorney who shall perform the legal services for the customer. Certainly this code entered into between the bar association and the corporate fiduciaries goes to great length in furthering the principle of divorcing the legal profession from the lay activities of the banks and trust companies. In the case at bar we have a very serious violation of this principle. We have a situation where a mortgage company and a law

partnership, both controlled by the same two men, are feathering each other's nest. The mortgage company's big selling point in its highly competitive business is the tie-up with the law firm, as a result of which more efficient service is offered to the customer. The law partnership allows the mortgage company to use this selling point, and as a result its own business is greatly increased. We have here a flagrant abuse of this principle that is prohibited in the code of the corporate fiduciaries.

The respondent-attorneys allowed the mortgage company to extend by advertisement an invitation to the public to come to them because of their speedy and efficient service available to a large extent because of the close tie-up with the law firm. As a matter of fact, there appears to be no doubt that Rothman actively encouraged such advertising, both in newspapers and in the dissemination of this information through the salesmen, while Irving, who undoubtedly had knowledge of same, acquiesced therein. The advertisement of the legal services available helped to increase the business transactions of the mortgage company, which in turn resulted in an increase in business of the law firm. Such advertising a lawyer has never been permitted to do in his own name; to allow the respondents to do so through an intermediary is to place the ethical practitioner at a great disadvantage in competing with those who would turn their profession into a business.

The decisions in other states, the opinions of authorized committees elsewhere, and the codes entered into by the New Jersey State Bar Association with related callings all support the conclusions we have reached on the basis of the controlling authorities in this state that the defendants have willfully and for long periods of time violated the 27th, the 35th and the 47th Canons of Professional Ethics.

## IV. THE MEASURE OF DISCIPLINE

While the justices subscribing to this opinion differ as to the extent of the discipline to be imposed on the respondents,

we are all agreed that they are at least deserving of severe reprimand. The bar is put on notice that similar offenses occurring hereafter will be dealt with more severely.

WILLIAM J. BRENNAN, JR., J. (dissenting). The majority finds that the activities of the mortgage company, the advertising and the sales efforts, were carried on primarily to produce professional legal employment for the law partnership so that respondents as the law partners and the owners of the mortgage company are guilty of violating Canon 27. But the majority opinion recognizes that the mortgage company realizes "substantial profits" from brokerage and "percentage point" and processing fees incurred by financial institutions which acquire the mortgages through the mortgage company, which fees are either paid by the institutions or are passed on by the institutions to the mortgagors. This income apparently exceeded by a considerable amount the legal fees received by the law partnership before its dissolution. The record, as I read it, clearly supports the inference that the advertising and sales efforts were directed exclusively to garnering the mortgage business and the mortgage fees which go with it; the professional work obtained by the partnership was an incident and not the object of the mortgage company's activities.

The majority also finds that the mortgage company, in violation of Canon 35, was interposed as an intermediary between the law partnership and those for whom legal services were rendered, the "customers" of the mortgage company. But the "customers" for whom legal services were rendered were primarily the mortgagees who loaned their money through the agency of the mortgage company, and I fail to see how the legal services rendered on behalf of the mortgagees could be said to have been performed in the interest of the supposed intermediary. True, the mortgagors, almost entirely individuals purchasing homes and apparently most of them G. I.'s, who responded to the opportunity offered them by the advertising to get mortgage loans through the mortgage company were often required to pay legal fees

charged for the services rendered to the mortgagees, and also the other charges for non-legal services. But that was a condition imposed by the mortgagees and is common and accepted practice in all such mortgage transactions and does not make the mortgagors the "customers" in any true sense. It may be that the mortgagors frequently did not retain their own attorneys independently to advise them as to the form and legal significance of the mortgage documents, but it is clear that they were entirely free to do so. It is also clear that the mortgagors paid no additional fees to the partnership.

The violation of Canon 47 is rested primarily upon the finding that the mortgage company offered a form of "one package deal" comparable to that condemned by this court in *In re L. R.*, 7 *N. J.* 390 (1951). This is attempted to be spelled out of the "publicity for the company's efficient and quick service in handling mortgage loans," the advertising of "the unusual facilities of its title plant and quick service 'under one friendly roof,'" and, as to some G. I. loans, the inclusion in the down payment of an amount for legal services. I cannot find that the advertisements anywhere emphasize legal services in the manner highlighted by the practitioner involved in *In re L. R.* They strike me as being more concerned with emphasizing the company's talent for cutting through the red tape incident to mortgage financing under governmental auspices, particularly as they involve G. I. loans. The inclusion of the legal fees in the down payment was nothing more than part of the program of the federal agencies to liberalize the terms upon which G. I.'s could purchase homes.

In any event, this case involves only questions of professional propriety. There is no suggestion that respondents did anything dishonest or that they imposed upon or dealt unfairly with the mortgagees, the borrowers or the public. The rules they are charged with transgressing are of the kind which it has been said "have as their main object to secure that no member of the profession shall have any but a purely professional interest in his work, by excluding the incentive of speculative profit," and the incidental object also "to pre-

vent the economic standards of the profession being lowered by unscrupulous competition," *E. H. Tawney, The Acquisitive Society* (1920). The obligations assumed by the practitioner thereunder when he joins the profession help preserve and foster the ideal of the profession, which subordinates the criterion of financial return as the mark of success, and the essence of which is that "though men enter it for the sake of livelihood, the measure of their success is the service which they perform, not the gains which they amass." *Tawney, supra.*

It is to be regretted that all who engage in the practice of the law do not primarily reserve themselves for the practice of their profession only. A business man seeking business may with complete propriety employ methods which if resorted to by a lawyer desiring professional employment would be dishonorable because unprofessional. The profession and the public interest are better served by the lawyers, fortunately the great majority, who do not attempt to make the inherently incompatible admixture. But our professional code does not require that practitioners refrain from commercial pursuits while at the same time actively practicing their profession. Chief Justice Qua of the Massachusetts Supreme Judicial Court has noted that "commonly a member of the bar is free to engage in commercial pursuits of an honorable character and to advertise and to extend his purely mercantile business honestly and fairly by ordinary commercial methods." *In re Thibodeau,* 295 *Mass.* 374, 3 *N. E. 2d* 749, 750, 106 *A. L. R.* 542 (1936). The business, however, must not be merely a cover behind which to solicit professional employment by methods denied the lawyer although proper for the business man seeking business for a business.

When alleged professional conduct concerns only matters of professional propriety, the attitude of the lawyers under inquiry toward their obligations under our professional code is, of course, of first importance. The majority says that the respondents "obviously resolved all doubts in their own favor and against the Canons of Professional Ethics, notwithstanding the fact that they must have been conscious

of their precarious position." I do not have that impression from my reading of the record. I see no evidence that their effort to live up to their professional obligations was and is not sincere. The evidence impresses me the other way. Mr. Irving first sought advice as far back as "the early part of 1946 and 1947" when the rapidly accelerating growth of the mortgage enterprise cramped their quarters and the practical difficulties of avoiding the mingling of personnel and activities became apparent. Changes were initiated from time to time to accomplish not only the fact but also the appearance of separateness between the mortgage business and the professional practice. These changes were made both before and after our decision in *In re L. R., supra,* and culminated in the arrangement which now exists and which existed at the time of the hearing before the committee. Under that arrangement the partnership of Rothman & Irving has been dissolved, nothing remotely suggesting legal services is done by the mortgage company or its affiliates, (indeed, I discover no proof that this ever was the case), Mr. Rothman devotes himself exclusively to the management of the mortgage business and has no participation in the proceeds of the law practice which Mr. Irving carries on with his own staff in quarters completely separated from, though located in the same building with, the mortgage company and its affiliated enterprises. In that posture of affairs it seems to me that, there being nothing whatever to indicate that the precautions taken to separate the business from the law practice now carried on exclusively by Mr. Irving are not real or that they cover any subterfuge, the respondents should be judged upon whether their present arrangement violates the canons or any of them and not upon practices or methods which have been abandoned. This was the conclusion reached by the Massachusetts Supreme Judicial Court in the not dissimilar situation presented in *In re Thibodeau, supra,* and appeals to my sense of justice and fairness to practitioners whose endeavors to live up to their professional obligations do not appear, on this record, to be lacking in sincerity. I agree that the mortgage company's

advertisements might be still further revised as regards the references to Mr. Rothman, the lawyer, but I see no reason to question the earnestness of the proffer by respondents at the opening and close of the hearings and repeated on the oral argument to make any additional changes indicated by the committee or the court as desirable in the interest of complete and literal compliance with the canons.

It is, of course, true that Mr. Irving's professional income is and.probably will continue to be realized largely from the professional work which comes to him from the mortgage company and its affiliates. In that sense the mortgage company is the "feeder" of his law practice. While he has no part whatever in the management of the mortgage business he is a one-third owner thereof and perforce shares in its success to the extent of the dividends on his stock interest. Is Mr. Irving's present situation, which, in my view, is the only just area of inquiry, in truth so "far removed" from that of innumerable past and present leaders of the bar who have been and are identified in executive capacities, as directors, and as owners, with building and loan associations, insurance companies, savings and loan associations, banks and trust companies, and like socially useful enterprises, with the result and in some cases for the purpose of having their law practices benefit from these connections? Neither the institutions nor the law practices which serve them have ever been any less socially useful because of the connection. And such institutions are of course peculiarly fruitful sources of legal work. If respondents' present arrangement, including Mr. Irving's retention of his one-third stock interest, is contrary to the canons, so also are these other arrangements which the bar knows are commonplace throughout the State. If these practices are to be prohibited that should be accomplished by unmistakable rules to be applied prospectively and equally among all members of the bar. Upon the plainest principles of simple fairness in the exercise of our disciplinary powers, these respondents should not be singled out for punishment.

Justices WACHENFELD and JACOBS join in this dissent.

564 

*Guilty and for reprimand*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BURLING—4.

*Not guilty and for dismissal*—Justices WACHENFELD, JACOBS and BRENNAN—3.