In the Matter of JACK A. CHARTOFF, Also Known as JACK CHARTOFF, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

In the Matter of ABRAHAM SCHWARTZ, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

First Department, May 3, 1962.

*Eric Nightingale* of counsel (*Michael Franck* with him on the brief), for petitioner.

*Copal Mintz* for respondents.

*Per Curiam.* The Referee has sustained four of six charges contained in the petition against both respondents, and two charges against respondent Chartoff alone. Chartoff age 34, was admitted in 1953, and respondent Schwartz, age 32, was admitted in 1951. They formed a law partnership in 1954.

Not long after the formation of their partnership, respondents engaged in real estate deals for their own account. They organized several corporations, which, as sole stockholders and chief officers, they actively managed and used interchangeably. From the methods of operation it is evident that the business activities were conducted on behalf of the partners, but in corporate dress. The charges against respondents relate to their conduct during a period commencing in August, 1957, and fundamentally stem from a financial deterioration which eventually resulted in the eviction of respondents from their law offices in November, 1958 for nonpayment of rent.

While we do not hold with the learned Referee on some of his findings, the following acts, in our opinion violative of professional standards, are definitely proven:

1. Approximately 90 checks, drawn not only on corporate accounts but on respondents' special account, were dishonored by drawee banks when presented. In part this resulted from respondents' slovenly attention to books of account, but there is no doubt that various checks were issued with knowledge that they would not be honored. That the instruments may have been postdated and many of them eventually paid does not justify such a practice (*Matter of Vyner,* 12 A D 2d 10; *Matter of Healy,* 11 A D 2d 4).

2. One Greenblatt, a former client, after negotiating with respondent Chartoff, made a $2,000 loan in August, 1957 to one of respondents' corporations, here called Korboco, and received therefor a note which respondents indorsed. The loan was solicited to make possible the purchase by Korboco of premises at 29 East 1st Street. In September, 1958, after the note matured and was in default, the property was sold. Although respondents recouped their own investment in the property out of the proceeds of sale, with more than enough remaining to repay Greenblatt the advance which enabled the purchase of the property, no part of the proceeds was turned

over to him. Further, in the same month he was given obligations which respondents must have known could not be paid and which were in fact not paid.

3. In April, 1958 one Smith, a lapidary, made a $4,000 loan to one of respondents' corporations, here called 331 **Corp.**, secured by a mortgage on premises at 422 East 14th Street. Chartoff represented to Smith that the money would be used solely for the improvement of the mortgaged premises, but at least a substantial part of it was not, and the promised improvement was not completed. In October, 1958, the loan having matured without payment, postdated Korboco checks, guaranteed by Chartoff, were given Smith and were not honored. A suit thereafter brought by Smith was settled by a stipulation requiring installment payments by respondents of $50 a week. No more than two installments were paid.

4. On June 12, 1958, a Dr. Rubin, a dentist practicing in New Jersey, made a $5,000 loan to 331 Corp. evidenced by a note maturing in two weeks, on June 26, 1958, and indorsed by respondents. He was also given a $5,000 check drawn on respondents' special account and, as security, the stock of 331 Corp. and the deed by which 331 Corp. had acquired title to its property at 331 East 90th Street. The stated purpose of giving him the deed was to prevent the sale of the property before repayment of his loan. It was not disclosed to him by Chartoff, who negotiated the transaction, that the property was incumbered by at least three mortgages and he was left with the impression that it was " free and clear ". The check, presented when the note matured, was dishonored, and it is manifest, from the copious evidence of respondents' acute financial distress, that they could not possibly have believed the check would be honored when they issued it. In October, 1958, without notice to Dr. Rubin, 331 Corp. contracted to sell its premises to York Investors, Inc. (York). Because of the seller's default the contract was not closed and the property was lost through foreclosure. Eventually Dr. Rubin was repaid $2,000.

5. When the above-mentioned contract with York was made, 331 Corp. received a down payment check for $1,500 which it promised to refund in the event of inability to convey title. Inability was certain unless all liens other than the first mortgage, as well as building violations, were removed. The only source of funds for their discharge was a deposit held by a lessor of one of respondents' corporations, a part of which deposit it was hoped would be forthcoming upon surrender of the leases. When the surrender took place, the lessor declined to commit itself to any amount. Despite this warning that the amount of

the deposit to be released might well be inadequate to permit closing with York, and despite respondents' almost penniless condition, the $1,500 down payment check was indorsed over to the third mortgagee in reduction of a note which respondents had indorsed. No part of the deposit was received, the closing failed, and York suffered the loss of its down payment. Ultimately it recovered half of the loss.

6. A small rent deposit, received by Chartoff for 331 Corp. from one of its tenants, was retained without complying with the provisions of section 233 of the Real Property Law or section 1302-a of the Penal Law.

Quoting from *Matter of Dolphin* (240 N. Y. 89, 92–93), this court said in *Matter of Wilcox* (243 App. Div. 103, 104), " ' it is well and abundantly settled that an attorney may be disciplined for misconduct even though such misconduct was outside of and not a part of his professional acts.' " While commercial activities are not forbidden a lawyer, he " must see that his dealings as a business man are as upright as should be his dealings in his professional capacity " (*Matter of Isaacs,* 172 App. Div. 181, 185; *Matter of O'Neil,* 228 App. Div. 129, 131), nor may he escape ethical responsibility by donning corporate garb (*Matter of O'Neil, supra; Matter of Spier,* 269 App. Div. 1058). If his " heedlessness and reckless disregard of consequence " (*State St. Trust Co.* v. *Ernst,* 278 N. Y. 104, 112) are so wanton as to shock the conscience, if those with whom he does business cannot help but regard his conduct as underhanded and deceitful, he casts discredit on his profession and proves himself unworthy of the high trust he assumed when he entered upon it.

Respondents conducted themselves in such unworthy fashion in the course of their commercial ventures, although none assumed the form of any lawyer-client relationship.

Neither respondent testified with the candor to be expected of members of the Bar. Each should be suspended for a period of two years.

BOTEIN, P. J., BREITEL, VALENTE, McNALLY and EAGER, JJ., concur.

Respondents suspended for a period of two years.