In the Matter of JONAS P. RELIN, an Attorney, Respondent.
NEW YORK STATE BAR ASSOCIATION, Petitioner.

Fourth Department, July 12, 1976

*William H. Gage (Paul J. Ginnelly* of counsel), for petitioner.

*John Van Voorhis* for respondent.

*Per Curiam.* Respondent was admitted to the Bar by this court on June 30, 1936.

### THE FIRST SPECIFICATION

In 1972 he undertook representation of Mrs. Bettie G. Blair, who was in financial distress and involved in matrimonial difficulties. He appeared four or five times on her behalf in Family Court and became counsel of record in separate pending divorce actions which had been brought by Mrs. Blair and by her husband.

Premises at 13 State Street, East Bloomfield, New York, had been owned for many years by ancestors of Mrs. Blair and came to be owned by Mrs. Blair and her husband. Respondent began a declaratory judgment action seeking a declaration that the property was solely Mrs. Blair's and that her husband had no lawful interest in it.

In settlement of the marital dispute, the husband deeded his ownership of the State Street property to Mrs. Blair and it was agreed that he would pursue his divorce action. A Family Court order which had been in effect before respondent began representing Mrs. Blair and which directed the husband to pay support for her and the children of the marriage, remained in force after the settlement.

There was an outstanding mortgage held by the Columbia Banking, Savings and Loan Association against the property, on which there was an unpaid principal balance of $4,600. Mrs. Blair was unable to make timely payments and the mortgagee brought a foreclosure action.

Alphonse Di Noto was an employee of West Point Business of which respondent was an owner. Di Noto was unknown to Mrs. Blair. Admittedly, Mrs. Blair wanted to keep her home if she could not find a buyer at what she thought was a fair price. Confronted with the loss of her home by virtue of the foreclosure action, and at the suggestion of respondent, Mrs. Blair signed a purchase offer which had been prepared by respondent and previously executed by Di Noto. Though the purchase price was $26,000, an insufficient sum in Mrs. Blair's view, she testified that she signed the purchase offer because respondent told her Di Noto was only a "figurehead" and that he would use Di Noto's credit to get the mortgage raised to $13,000. Respondent also told her that the bank would not increase the mortgage for her because of her poor credit.

On September 25, 1972 Di Noto applied to Columbia Banking, Savings and Loan Association, based upon the purchase offer, for a mortgage in the amount of $13,000. The mortgage was approved and the transaction was closed on October 25, 1972 with only the bank attorney, Di Noto and respondent present at the closing. Though Mrs. Blair had previously signed a deed to the property in respondent's office, she claimed that respondent told her that it was a "matter of getting credit rating from Columbia".

Significantly, every expense and deduction of the mortgage transaction, including bank attorney's fee, respondent's counsel fee, State mortgage tax and all recording fees, were charged to Mrs. Blair. Furthermore, respondent actually paid Di Noto $200, also charged to Mrs. Blair, as either a "mortgage placement fee" (according to respondent's closing statement), or as consideration of an alleged oral buy-back agreement between Mrs. Blair and Di Noto, an agreement which Mrs. Blair asserts was never made or discussed.

The mortgagee was totally unaware of the true nature of the mortgage transaction, or of any alleged oral buy-back agreement, and acted in the good faith belief that Di Noto was a bona fide purchaser of the property.

Though the purchase offer provided for a $5,000 cash payment at closing and a note from Di Noto to Mrs. Blair for $8,000 payable in six months, Di Noto and respondent both testified that Di Noto signed a $13,000 note which was retained by respondent, in escrow, because of the alleged buy-back agreement.

In addition to the charges heretofore set out, respondent deducted from the mortgage proceeds, modest sums for the satisfaction of two outstanding judgments, and the sum of $3,700 in payment for his services to Mrs. Blair. Of that figure, $650 was charged for his representation in the matrimonial actions and in the Family Court matter, and $3,000 for his services in arranging for the deed from Mr. Blair and in representing her in the real estate transaction. It should be noted that respondent also represented Di Noto in that transaction and that the fee for services to him was also paid by Mrs. Blair. She received a net check from respondent in the sum of $1,375.68.

Mrs. Blair and her children continued to live in the property and she later demanded a deed of the property back to her from Di Noto. Such a deed was prepared by respondent,

executed by Di Noto on April 30, 1973, and recorded. There was no formal closing of this transaction. Mrs. Blair neither attended such a closing, nor did she ever receive a closing statement.

Once again Mrs. Blair was unable to make timely mortgage payments. Respondent agreed with counsel for the mortgagee that respondent would serve the summons and complaint in a foreclosure action on both Di Noto and Mrs. Blair. Though he claims not to have represented Mrs. Blair in this foreclosure action, he filed a notice of appearance so that he would be aware of what the mortgagee was doing.

On the day before the foreclosure sale respondent prepared the following agreement which was executed by both respondent and Mrs. Blair:

> "TO Mrs. Bettie G. Blair                Date August 23, 1973
>     13 State Rd.
>     E. Bloomfield, N.Y.
>
> "Dear Mrs. Blair:
>
> "I plan to attend the foreclosure and bid more than the bank balance. If I am the successful bidder, you can stay on the property rent free until Sept. 30. If you find a buyer during this time I will pay you all net proceeds over $23,000. If the proerty *[sic]* is not *[sic]* by then, you can stay until Oct. 31 rent free. Any sale entered into before that date will mean payment to you of any net amount over $32,000.
> Accepted: s/Bettie G. Blair          s/J. P. Relin"

The foreclosure sale was held on August 24, 1973. Respondent, the only bidder, bought the property for $15,000 in the name of Jay Holworthy, Inc., a corporation of which he is an officer. Thus ownership of a home which long had been in the family of Mrs. Blair and which in the spring of 1972 was encumbered only by a mortgage of $4,600 and judgments in modest amounts, a little more than a year later was transferred to the interests of the lawyer she had retained to protect her.

Implicit in the findings of the Supreme Court Justice who heard these charges is a rejection of respondent's explanation of the material events in this whole transaction. We concur in his findings and we affirmatively find that respondent engaged in professional misconduct in that he:

1. had personal knowledge that Alphonse Di Noto was a

fictional purchaser and that in representing Alphonse Di Noto in the mortgage transaction with Columbia Banking, Savings and Loan Association, he attempted to and did deceive that association for the purpose of procuring additional mortgage money for Mrs. Bettie G. Blair;

2. retained from the mortgage proceeds an excessive fee for his services on behalf of Mrs. Bettie G. Blair, and improperly charged her with fees, disbursements and expenses which lawfully were chargeable to others;

3. attempted to obtain an unconscionable gain from the plight of Mrs. Bettie G. Blair in causing the execution of the agreement of August 23, 1973; and

4. engaged in conduct involving dishonesty, fraud, deceit and misrepresentation.

### THE SECOND SPECIFICATION

In April, 1967 Charlie Jay's, Inc., a corporation owned by respondent's brother, leased certain improved real property, which included a tavern, to Harold and Lorraine Kimball. At that time, respondent was either president or vice president of the corporation and the Kimballs operated the tavern under a liquor license issued to Charlie Jay's, Inc.

In November, 1967 the Kimballs, representing that they owned both the tavern and the corporation, leased the premises to Peter Giorgione. Respondent, as attorney for the Kimballs, advised Giorgione that he could operate the tavern under the corporate liquor license. It has been established in these proceedings that respondent knew that the use of the corporate liquor license, in such circumstances, was illegal.

Within four weeks after the commencement of Giorgione's tenancy, he ascertained that he was improperly operating the tavern under a license issued to another and sought to terminate the lease. A meeting was held at which it was agreed that Giorgione would return the keys to the premises and the Kimballs would refund $2,000 to Giorgione, which sum represented a portion of his rental deposit. Following the attainment of this agreement which had been negotiated by respondent, Kimball stated that he did not have $2,000, whereupon Giorgione indicated a reluctance to return the keys. Respondent, however, asked that the transfer take place immediately and stated that he would guarantee the payment of the money the next day. In reliance upon respondent's representation,

Giorgione relinquished the keys. Neither the Kimballs nor respondent have paid Giorgione. Respondent asserts here that his statement should be construed to mean only that he believed the Kimballs would make the payment. Such an interpretation, however, contravenes both the language of the representation and the circumstances in which it was made.

It was not until approximately three years later that Giorgione discovered that respondent was associated with Charlie Jay's, Inc., that it had not been owned by the Kimballs, and that the realty was, in fact, owned by Jay Holworthy, Inc. Respondent was also vice president of the latter corporation.

When the Grievance Committee of the Monroe County Bar Association inquired of respondent as to who owned Charlie Jay's, Inc. and Jay Holworthy, Inc., and who held the liquor license, respondent replied as follows:

"As to the later part of your letter requesting information about the business of other clients of this office, I feel I would be remis [sic] in giving you any information and that any information that is to be supplied should come from the client."

Without deciding the merits of respondent's invocation of the attorney-client privilege, his efforts to co-operate with the Bar Association were less than complete and tainted by the absence of good faith. We find it appropriate here, as we did in a prior proceeding involving this same respondent (Matter of Relin, 19 AD2d 460), which resulted in his suspension for three months, to quote the language of Matter of Chartoff (16 AD2d 277, 280) that a lawyer may not "escape ethical responsibility by donning corporate garb".

We find, in connection with the second specification, that respondent engaged in professional misconduct in that he:

1. advised Giorgione that he could operate the tavern under the liquor license of another when he knew that such conduct was in violation of the law; and

2. falsely promised to guarantee payment of the moneys due Giorgione, with the purpose of obtaining Giorgione's reliance upon that promise.

## CONCLUSION

Respondent has violated DR1-102 (A) (4), DR5-101 (A), DR5-103 (A), DR5-107 (A) (1), DR7-102 (A) (5) (7) (8), and should be

suspended from the practice of law for a period of two years and until further order of this court.

MARSH, P. J., MOULE, CARDAMONE, SIMONS, and DILLON, JJ., concur.

Order of suspension entered.